Filed 4/19/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| CERTAIN UNDERWRITERS AT LLOYD'S LONDON et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> CONAGRA GROCERY PRODUCTS COMPANY et al., <br><br> Defendants and Appellants. | A160548 <br><br> (San Francisco County Super. Ct. No. CGC-14-536731) |

This insurance coverage case arises from an underlying representative public nuisance action in which a number of former manufacturers of lead paint were ordered to pay $1.15 billion into a fund to be used to abate the public nuisance created by interior residential lead paint in 10 California jurisdictions. The question presented is whether the trial court correctly determined that ConAgra Grocery Products Company (ConAgra), as successor to paint manufacturer W.P. Fuller & Co. (Fuller), was not entitled to indemnity from its insurers for its payment to the abatement fund due to Insurance Code section 533, which provides that insurers are not liable for losses caused by a willful act of the insured.

## BACKGROUND

This case began in 2000, when the County of Santa Clara, subsequently joined by multiple other counties and governmental entities, filed a class action complaint against a number of lead paint manufacturers. (*County of*

*Santa Clara v. Atlantic Richfield Co.* (2006) 137 Cal.App.4th 292, 299 (*Santa Clara I*).) After several amendments of the complaint, the trial court sustained demurrers to causes of action for public nuisance, one a claim by the class plaintiffs seeking damages and the other a representative action on behalf of the People of the State of California seeking abatement. (*Id.* at pp. 299–301.) The court later granted the defendants' motion for summary judgment on other causes of action and entered a judgment of dismissal. (*Id.* at pp. 301–303.)

On appeal, the Sixth District Court of Appeal held the trial court erred in sustaining the demurrer to the cause of action for representative public nuisance and granting summary judgment on three others. (*Santa Clara I, supra*, 137 Cal.App.4th at p. 333.) As to the cause of action for representative public nuisance, the court explained that liability was "premised on defendants' *promotion of lead paint for interior use* with knowledge of the hazard that such use would create." (*Id.* at p. 309.) *"Because this type of nuisance action does not seek damages but rather abatement, a plaintiff may obtain relief before the hazard causes any physical injury or physical damage to property."* (*Ibid.*)

On remand, on March 16, 2011, the plaintiffs[1] filed a fourth amended complaint alleging a single cause of action for representative public nuisance on behalf of the People. The complaint alleged that the presence of lead in paint and coatings in and around homes and buildings in California has created a massive public health crisis and that defendants created and/or assisted in the creation of this nuisance by, among other things, promoting

---

[1] The fourth amended complaint was filed by the People, acting by and through the County Counsel of Santa Clara, Alameda, Los Angeles, Monterey, San Mateo, Solano, and Ventura counties and the City Attorneys of Oakland, San Diego, and San Francisco.

2

lead for interior and exterior use despite having known for nearly a century that such use of lead was hazardous to human beings. Following a trial in 2013, the trial court found ConAgra and two other companies (NL Industries, Inc. and the Sherwin-Williams Company) jointly and severally liable and ordered establishment of a fund dedicated to abatement of lead paint in pre-1978 homes in the 10 jurisdictions represented in the case.[2] The court's lengthy and detailed statement of decision (113 pages) and proposed judgment were filed on January 7, 2014. On March 26, 2014, the trial court issued an amended statement of decision (*People v. Atlantic Richfield Co.* (Super. Ct., Santa Clara County, 2014, No. 100CV78865) 2014 WL 1385823 [amended statement of dec.]) and amended judgment (*People v. Atlantic Richfield Co.* (Super. Ct., Santa Clara County, 2014, No. 100CV78865) 2014 WL 1385821 [amended judg.]) requiring the three companies to pay $1.15 billion into the abatement fund.

ConAgra and the other two companies appealed. The Sixth District Court of Appeal rejected most of the challenges to the judgment, but reversed for recalculation of the abatement fund to exclude the cost of remediating lead hazards in post-1950 housing, as there was no evidence the companies affirmatively promoted lead paint for interior use after 1950 and insufficient evidence of a causal connection between the companies' earlier promotions and interior lead paint in homes built after 1950. (*People v. ConAgra Grocery Products Co.* (2017) 17 Cal.App.5th 51 (*Santa Clara II*).) The California Supreme Court denied review and the United States Supreme Court denied certiorari. (*Ibid.*, review den. Feb. 14, 2018, cert. denied (2018) ___ U.S. ___, 139 S.Ct. 377.)

---

[2] The United States Consumer Product Safety Commission prohibited the use of lead-based paint in homes in 1978. (16 C.F.R., § 1303.4.)

3

On remand, the trial court recalculated the amount to be paid into the abatement fund to $409 million. After an offset for payment by another lead paint manufacturer no longer in the case, the total amount to be paid into the fund was reduced to $401,122,482.

On July 10, 2019, the parties executed a settlement agreement under which ConAgra, NL Industries, Inc. and Sherwin-Williams Company each agreed to pay $101,666,666 in full satisfaction of any and all claims.

Meanwhile, just after the trial court filed its initial statement of decision in January 2014, Certain Underwriters at Lloyd's London and other insurers had filed a first amended complaint for declaratory relief, seeking a determination that they had no coverage obligation to ConAgra with respect to or arising from this case under policies issued to ConAgra and/or its predecessor companies. The declaratory relief action was stayed on April 2, 2014, and the stay was lifted as of March 13, 2019. On March 22, 2019, ConAgra filed its answer, seeking dismissal of the first amended complaint and judgment in ConAgra's favor, and a cross-complaint for declaratory relief, seeking a determination that it was entitled to coverage under specified primary and excess liability insurance policies.[3]

On July 19, 2019, the insurers moved for summary judgment or, in the alternative, summary adjudication. The insurers argued they had no duty to provide coverage for four reasons: (1) section 533 prohibits coverage for ConAgra's intentional promotion of lead paint or interior; residential use with

---

[3] Exhibit A to the cross-complaint listed insurance policies issued to ConAgra and its predecessors Hunt Foods and Industries, Norton Simon, Inc., and Esmark, Inc. The policies themselves (including policies issued to Beatrice Companies, Inc., and BCI Holdings Corporation), and a joint summary of their language, were submitted to the court in connection with the motions for summary judgment and summary adjudication as "examples of language from ConAgra's insurance policies."

4

actual knowledge of the health hazard that would result; (2) there was no "occurrence" within the meaning of the policies because the harm was expected or intended and not accidental; (3) the abatement remedy was not liability for "damages" or an "expense" under the policies; and/or (4) ConAgra's liability was not "because of" or "on account of" "bodily injury," "property damage" and/or "personal injury" under the policies. ConAgra moved for summary adjudication, arguing each of the issues raised in the insurers' motion should be resolved in favor of ConAgra.

In connection with this motion, ConAgra submitted the parties' "Joint Stipulation of Undisputed Evidence," which essentially summarized the chronology of the underlying litigation, and "Joint Stipulated Summary of Policies and Policy Language," which included the policies themselves as exhibits.

The trial court granted summary judgment in favor of the insurers, holding that Insurance Code section 533[4] precluded coverage as a matter of law because it " 'precludes indemnification for liability arising from deliberate conduct that the insured expected or intended to cause damage' "; " 'willful act of insured' includes an act 'intentionally performed with knowledge that damage is highly probable" (quoting *Shell Oil Co. v. Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 742–743 (*Shell Oil*)); and courts in the underlying litigation "clearly and repeatedly found" that "Fuller intentionally promoted lead paint with knowledge that damage to children was at least highly probable." The court specifically rejected ConAgra's arguments that it was "only Fuller's 'purported' successor"; that ConAgra, as successor, could be " 'insulated from its predecessor's

---

[4] Further statutory references will be to the Insurance Code except as otherwise specified.

5

knowledge' "; that the scienter findings in the underlying litigation were insufficient to meet the willfulness standard in section 533; that Fuller's conduct was merely reckless; that the insurers were required to, and did not, prove Fuller's senior managers knew the hazards of lead paint; and that *Santa Clara II* erred in requiring remediation of lead paint applied after 1950 in homes built before 1950.

Judgment was entered on June 2, 2020, and ConAgra filed a timely notice of appeal.[5]

---

[5] Three trial courts in other jurisdictions have ruled in insurance coverage cases involving other defendants in the underlying action. Two granted summary judgment for the insurers, one because the cause of action for representative public nuisance was not for property damage within the meaning of the insurance policies (*Millennium Holdings LLC v. Lumbermens' Mut. Cas. Co.* (Ohio Com. Pl. Aug. 8, 2013, 00-CV-411388) 2013 WL 12344184) and the other because *Santa Clara II*'s conclusion that the remedy of abatement did not constitute damages compelled the trial court to find there were no recoverable damages under the policies (*Sherwin-Williams Co. v. Certain Underwriters at Lloyd's London* (Ohio Com. Pl., Dec. 3, 2020, CV-06-585786 (*Sherwin-Williams*)). The third trial court denied summary judgment. (*Certain Underwriters at Lloyd's London v. NL Industries, Inc.* (N.Y. Supreme Court, Dec. 29, 2020, 650103/2014 (*NL*).)

*Millennium* did not address issues relevant to our analysis of the application of section 533. *Sherwin-Williams* and *NL* both rejected arguments that insurance coverage was unavailable because the harm for which the insured was held liable was expected or intended. Both courts viewed the underlying litigation as having established that the defendants had actual knowledge of the dangers associated with lead paint but not that they expected or intended to cause the harm. *Sherwin-Williams* declined to view the nuisance found in the underlying action as expected or intended, seeing it as analogous to intentionally advertising or placing into commerce a product that results in injury without having intended the injury to occur, and expressly held the defendant was not "substantially certain" its promotions would result in injury or property damage. *NL* similarly emphasized that New York law distinguishes between "knowledge of the risk of hazardous consequences of one's actions, and the intention to cause harm,"

6

## DISCUSSION

A motion for summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.) Here, as the moving parties, the insurers bore the burden of demonstrating, based on undisputed facts, that coverage could not be established. (See *Advent, Inc. v. National Union Fire Ins. Co. of Pittsburgh, PA* (2016) 6 Cal.App.5th 443, 458.)

Section 533 provides that "[a]n insurer is not liable for a loss caused by the wilful act of the insured; but he is not exonerated by the negligence of the insured, or of the insured's agents or others." " 'Section 533 is "an implied *exclusionary clause* which by statute is to be read into all insurance policies." [Citations.]' " (*Shell Oil, supra*, 12 Cal.App.4th at p. 749, quoting *J.C. Penney Casualty Ins. Co. v. M.K.* (1991) 52 Cal.3d 1009, 1019 (*Penney*).) The statute reflects a fundamental public policy of denying coverage for willful wrongs and discouraging willful torts. (*Penney*, at pp. 1019–1021, fn. 8 and accompanying text.) " 'The public policy against insurance for losses resulting from such [willful wrongful] acts is usually justified by the

---

citing one case that held selling asbestos with knowledge of its risk of harm was not equivalent to intending to cause harm, and another case that held intentional operation of a cement plant did not establish the defendant intended to cause damage to surrounding landowners or was substantially certain damage would result.

The insurers' briefs represent that *Sherwin-Williams* and *NL* are currently on appeal. *NL* has since been affirmed by the Appellate Division of the New York Supreme Court. (*Certain Underwriters at Lloyd's London v. NL Industries, Inc.* (N.Y.App. Div., Mar. 24, 2022, 650103/14) 2022 N.Y.App. Div. LEXIS 1941.)

assumption that such acts would be encouraged, or at least not dissuaded, if insurance were available to shift the financial burden of the loss from the wrongdoer to the insurer. . . .' " (*Downey Venture v. LMI Ins. Co.* (1998) 66 Cal.App.4th 478, 514 *(Downey)*, quoting *American States Ins. Co. v. Borbor* (9th Cir. 1987) 826 F.2d 888, 895 (*Borbor*); *PPG Industries, Inc. v. Transamerica Ins. Co.* (1999) 20 Cal.4th 310, 316, fn. 1, 317–318.) "As a statutory exclusion, section 533 is not subject to the rule of strict construction against an insurer; instead, we construe it according to the Legislature's intent, for which we refer first to the words of the statute. ([*Penney*], at p. 1020, fn. 9 and accompanying text.)" (*Shell Oil*, at p. 739.)

A "wilful act" under section 533 means "an act deliberately done for the express purpose of causing damage or intentionally performed with knowledge that damage is highly probable or substantially certain to result." (*Shell Oil*, *supra*, 12 Cal.App.4th at p. 742; *Downey*, *supra*, 66 Cal.App.4th at p. 500.) "Conduct for which the law imposes liability, and which is expected or intended to result in damage, must be considered wrongful and willful. Therefore, section 533 precludes indemnification for liability arising from deliberate conduct that the insured expected or intended to cause damage." (*Shell Oil*, at p. 743; *Downey*, at p. 501.) "The appropriate test for 'expected' damage is whether the insured knew or believed its conduct was substantially certain or highly likely to result in that kind of damage." (*Shell Oil*, at p. 748.) On the other hand, "no form of negligence amounting to less than section 533's 'wilful act' precludes coverage. (*Penney, supra*, [52 Cal.3d] at p. 1021.)" (*Shell Oil*, at p. 740.) Thus, "[a]cts of gross negligence or recklessness are not wilful acts within the meaning of section 533." (*Downey*, at p. 500.)

An insurer's duty to indemnify "is only determined when the insured's underlying liability is established." (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 287.) "The duty to indemnify on a particular claim is determined by the actual basis of liability imposed on the insured." (*Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co.* (1996) 45 Cal.App.4th 1, 108 (*Armstrong*).)

As we have said, ConAgra was found liable in the underlying case as corporate successor to Fuller; ConAgra itself played no role in the lead paint business. ConAgra's arguments on appeal take two tacks, one attempting to distance itself from Fuller's conduct and knowledge and the other attempting to avoid application of section 533 even assuming Fuller's conduct and knowledge are the determinative factors.

## I.

ConAgra argues section 533 does not apply because the statute precludes coverage for losses due to a willful act of "the insured," ConAgra is "the insured," and ConAgra (as opposed to Fuller) committed no wrongful act. It maintains applying section 533 to bar insurance coverage for its losses as successor to Fuller does not serve the policy purposes of the statute because, since Fuller committed the willful act, requiring ConAgra to bear the loss cannot be justified as precluding a party from benefitting from his or her own wrong or preventing intentional misconduct. ConAgra maintains that no authority supports applying section 533 to liability based on corporate succession for losses arising decades after the wrongful conduct of the predecessor.

ConAgra was held liable as Fuller's corporate successor through a series of mergers and consolidations: *Santa Clara II* upheld the trial court's finding that "Fuller's liabilities flowed from Hunt to Norton Simon and

9

through it to ConAgra" (*Santa Clara II*, *supra*, 17 Cal.App.5th at p. 162), and that determination is final and binding. Such a merger results in the successor corporation assuming the liabilities of the predecessor. (*Certain Underwriters at Lloyd's of London v. Pacific Southwest Airlines* (C.D. Cal. 1992) 786 F.Supp. 867, 870–871 (*Pacific Southwest*); *Moe v. Transamerica Title Ins. Co.* (1971) 21 Cal.App.3d 289, 304.)

As explained in *Pacific Southwest*, application of section 533 is appropriate in this situation because the successor in a merger is "on notice that it [is] purchasing [the predecessor] subject to the liabilities of [that entity]." (*Pacific Southwest*, *supra*, 786 F.Supp. at p. 871.) "[T]he successor entity . . . is responsible as the wrongdoer, in the sense that the successor knew that the predecessor may have committed some wrongdoing and thereby agreed to assume any liability therefore." (*Ibid.*)

ConAgra's argument against application of section 533 relies on cases holding that section 533 does not apply where the insured is found liable on a theory of vicarious liability. (E.g., *Nuffer v. Insurance Co. of North America* (1965) 236 Cal.App.2d 349, 355–356 [rules governing liability of principal for wrongful act by agent do not control insurer's liability for loss sustained by principal due to act of agent]; *Borbor*, *supra*, 826 F.2d at p. 890 [insurer of husband and wife operating nursery school not liable for coverage of husband, who intentionally molested children, but wife entitled to coverage despite being vicariously liable for husband's acts under partnership principles]; *Downey*, *supra*, 66 Cal.App.4th at p. 512 [§ 533 does not bar coverage for insured held vicariously liable for another person's act of malicious prosecution]; *Century-National Ins. Co. v. Garcia* (2011) 51 Cal.4th 564, 566, 573 [innocent insured parents entitled to coverage under fire insurance policy despite intentional arson by co-insured adult son; section

10

533 does not bar coverage for innocent insured for loss caused by willful act of a coinsured].)  "The public policy underlying section 533—to deny coverage for and thereby discourage commission of wilful wrongs—is not implicated when an insurer indemnifies an 'innocent' insured held liable for the willful wrong of another person[.]"  (*Downey*, at p. 514.)

ConAgra contends the same rationale applies to its situation.  Arguing that the policy of deterring willful misconduct "is not implicated unless the insured was personally at fault," ConAgra maintains allowing it to recover from insurance would not encourage misconduct because it had no role in or knowledge of Fuller's conduct.  *Pacific Southwest* specifically rejected such an attempt to analogize the position of a corporate successor, for purposes of section 533, to that of an employer held vicariously liable for its employee's willful act.  *Pacific Southwest* involved a punitive damages award due to intentional tortious conduct by the predecessor corporation.  (*Pacific Southwest, supra*, 786 F.Supp. at pp. 869–870.)  Section 533 normally precludes insurance coverage for punitive damages, but such coverage is not precluded in vicarious liability cases where an employer is required to pay punitive damages as a result of actions by an employee.  (*Pacific Shouthwest*, at p. 869.)  "Section 533 prohibits indemnification of punitive and intentional tort damages in part because wrongdoing would not be deterred by damage awards if a party could simply indemnify itself against such awards.  In the case of an employer, the employer has committed no wrong.  Therefore, the employer is undeterrable and allowing indemnification does not violate the policy behind Section 533."  (*Ibid.*)

Rejecting the successor corporation's argument that it was similarly undeterrable because it committed no wrong, *Pacific Southwest* held that since the merger resulted in the successor corporation assuming the

liabilities of the predecessor, the successor was "responsible as the wrongdoer." (*Pacific Southwest, supra,* 786 F.Supp. at pp. 869, 871.) "In such cases, successor liability is not the functional equivalent of vicarious liability and Section 533 applies." (*Id.* at pp. 869, 871.)

ConAgra reads *Pacific Southwest* as holding "successor liability is not the functional equivalent of vicarious liability" only in cases where "the successor knew that the predecessor may have committed some wrongdoing and thereby agreed to assume any liability therefore." (*Pacific Southwest, supra,* 786 F.Supp. at p. 871.) By contrast, ConAgra argues, here there is no evidence it had knowledge of Fuller's lead paint promotions "when the acquisition occurred."

*Pacific Southwest* involved an award of punitive damages in favor of an employee of Pacific Southwest Airlines (PSA) on a claim of intentional infliction of emotional distress during his employment by PSA. US Airways (USAir) had acquired PSA subsequent to the tortious conduct and was held liable in the employee's action. (*Pacific Southwest, supra,* 786 F.Supp. at pp. 868, 873.) The opinion does not actually say USAir knew of PSA's conduct toward the employee at the time of the merger, as ConAgra suggests; the facts provided in the opinion indicate the tortious conduct preceded the merger and the lawsuit named both PSA and USAir as defendants, but do not include the date of the merger or details of the companies' negotiations. As to successor liability, *Pacific Southwest* explained, "[t]he form of the merger . . . demonstrates that USAir took subject to the liabilities of PSA and thus the vicarious liability analogy does not apply. PSA was purchased by USAir through a large-scale purchase of PSA's stock. USAir, itself, refers to this purchase as a merger and no evidence has been offered to the contrary. As a result, the Court can properly hold USAir liable for punitive damages

12

because USAir was aware of the possibility of such liability. This Court concludes that the form of the merger did in fact put USAir on notice that it was purchasing PSA subject to PSA's debts and liabilities. In such cases, successor liability is not the functional equivalent of vicarious liability and Section 533 applies." (*Id.* at p. 871.)

Contrary to ConAgra's reading, we do not understand *Pacific Southwest* to have held that a corporate successor's liability for willful conduct by its predecessor turns on a factual determination whether the successor knew at the time of the merger of specific liability or potential liability on the part of the predecessor. *Pacific Southwest* held that *by virtue of the merger*, USAir was on notice that *if* liability was established against PSA, USAir would be liable as PSA's successor. That is the situation here: As successor to Fuller through a series of mergers, ConAgra became liable for the public nuisance created by Fuller's conduct and, therefore, stands in Fuller's shoes for purposes of section 533.[6]

---

[6] The insurance policy under which USAir sought indemnity in *Pacific Southwest* had been issued to PSA. (*Pacific Southwest, supra,* 786 F.Supp. at p. 869; see also, *PPG Industries, Inc. v. Transamerica Ins. Co., supra,* 20 Cal.4th at p. 316, fn. 1 ["[successor] could not accept the benefits of its acquisition of [predecessor] by bringing this action to recover under [predecessor's] insurance policy . . . without also accepting the liabilities"].) In the present case, some of the insurance policies ConAgra relies upon were issued directly to ConAgra as the insured while others were issued to various predecessors (Hunt Foods and Industries, Norton Simon, Inc., Esmark, Inc., Beatrice Companies, Inc., BCI Holdings). (See fn. 2, *ante.*) The parties do not suggest there is any distinction between these policies meaningful to the application of section 533 in this case.

## II.

## A.

ConAgra contends that even if the focus is on Fuller's conduct, section 533 is inapplicable because the loss for which ConAgra seeks indemnity was too attenuated from Fuller's promotions for section 533 to apply. The statute, in ConAgra's view, requires both a "direct causal relationship" and a "close temporal connection" between the willful act and the loss for which insurance coverage is sought; according to ConAgra, every case in which section 533 has been found to apply involved losses resulting within "seconds, days, or weeks of the insured's act." ConAgra maintains the underlying findings do not satisfy the requirements of section 533 because *Santa Clara II* held only a few of Fuller's promotions were actionable (i.e., willful acts for purposes of section 533), the underlying courts did not attempt to trace the harm back to the actionable promotions, and those promotions "could not possibly have caused *all* of the loss for which ConAgra is now liable." As ConAgra sees it, section 533 could apply only if there was proof Fuller's promotions resulted in the harm in each individual home for which ConAgra was required to fund inspection and/or abatement.

ConAgra relies upon cases holding section 533 does not bar coverage for losses resulting from acts that are separable from the willful act for which insurance is precluded. In *Horace Mann Insurance Co. v. Barbara B.* (1993) 4 Cal.4th 1076, 1078–1079, a 13-year-old student sued her teacher for injuries resulting from sexual molestation (as to which the teacher pleaded nolo contendere) and other harassing conduct. The insurer maintained it had no duty to defend or indemnify the teacher pursuant to section 533 and prevailed on a motion for summary judgment. (*Id.* at p. 1080.) Reversing, *Horace Mann* found that although section 533 precluded coverage for

14

damages arising from the sexual molestation, there were factual disputes regarding the teacher's alleged conduct apart from the molestation and, therefore, potential coverage. (*Id.* at pp. 1081–1083.) "The record is devoid of evidence which establishes the chronology or sequence of events comprising the alleged misconduct or that these actions were integral to the molestation. For instance, the record is devoid of evidence demonstrating that Lee's acts of public embarrassment of Barbara occurred in such close temporal and spatial proximity to the molestation as to *compel* the conclusion that they are inseparable from it for purposes of determining whether [the insurer] owed a duty to defend Lee." (*Id.* at pp. 1083–1084.) *State Farm Fire & Casualty Co. v. Century Indemnity Co.* (1997) 59 Cal.App.4th 648, 665, the other case ConAgra cites, did not discuss section 533 but, applying the reasoning of *Horace Mann*, held an insurer had a duty to defend claims against the insured for alleged nonsexual conduct that was "temporally and spatially separate" from alleged sexual conduct the insurance policy did not cover.

These cases held that where an insured is liable for losses due to multiple separate acts, some willful and others not, section 533 precludes insurance coverage for losses resulting from the willful acts but allows coverage for the others. The cases considered the temporal proximity of the acts in determining whether the non-willful act is in fact separate from the willful one, or must be considered integral to the willful act so as to make section 533 applicable to both. That is, these cases considered temporal proximity between separate acts alleged to have resulted in loss, not temporal proximity between a given act and the loss resulting from it. ConAgra does not explain how this analysis supports its argument that section 533 applies only if the harm resulting from a willful act of the insured occurs close in time to the act. As the insurers point out, cases concerning

15

insurance coverage for losses associated with environmental contamination demonstrate section 533 can apply, if the factual predicate is met, where the acts causing damage occurred many years before the loss for which the insured seeks indemnity. *Shell Oil*, for example, upheld a determination that the insured was not entitled to coverage when it was held liable for soil and groundwater contamination decades after the conduct that caused the contamination.[7] (See *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 837, fn. 16; *FMC Corp. v. Plaisted & Companies* (1998) 61 Cal.App.4th 1132, 1179–1180 (*FMC*), disapproved on other grounds in *State of California v. Continental Ins. Co.* (2012) 55 Cal.4th 186, 201.)[8]

---

[7] *Shell Oil* involved insurance claims for remediation costs for 30 years of soil and groundwater pollution. (*Shell Oil*, *supra*, 12 Cal.App.4th at p. 784.) The court upheld as consistent with section 533 a jury instruction stating a liability policy could cover property damage only if the insured neither expected nor intended the damage, but found erroneous an instruction defining "expect" by an objective standard that deviated from section 533 by testing what the insured should have known rather than what it actually knew or believed. (*Shell Oil*, at pp. 742–743, 747–748.) As to one particular source of pollution, however, *Shell Oil* found this error was not prejudicial because, since the evidence showed that "[b]y 1965, Shell expected that the wastes it dumped in Section 36 would eventually result in damage to others' property," there was no reasonable probability the jury, if properly instructed to use a subjective standard for "expect," would have found Shell had coverage for pollution from this source. (*Id.* at p. 777.)

[8] *FMC* involved remediation costs for which the insured became liable under environmental statutes many years after the acts that caused the pollution. Applying the definition of "expected" established in *Shell Oil*, *supra*, 12 Cal.App.4th at page 748, the trial court had rejected the insured's argument that its insurance policies provided coverage for unexpected damage to third party property that exceeded or differed from property damage it was found to have expected. Approving the trial court's view, the *FMC* court explained: "If (as the policy language and the trial court's instruction required to avoid coverage) *any* of the third party property damage resulting from FMC's knowing release of pollutants was not

16

ConAgra attempts to distinguish the environmental pollution cases by arguing they involved gradual damage that was "*inevitable* without intervening actions from any third parties." Here, ConAgra maintains, not only was ConAgra held liable for a public nuisance decades after Fuller's promotions of lead paint, those promotions could have resulted in current lead hazards "only if (1) people were influenced by Fuller promotions (above all other lead paint promotions), (2) those so influenced placed lead paint inside of homes, (3) that paint gradually deteriorated, and (4) the paint was not properly maintained or abated in the ensuing decades."

*Santa Clara II*, *supra,* 17 Cal.App.5th at page 104, conclusively rejected this sort of argument in the context of ConAgra's liability. "The connection between the long-ago promotions and the current presence of lead paint was not particularly attenuated. Those who were influenced by the promotions to use lead paint on residential interiors in the 10 jurisdictions were the single conduit between defendants' actions and the current hazard. Under these circumstances, the trial court could have reasonably concluded that defendants' promotions, which were a substantial factor in creating the current hazard, were not too remote to be considered a legal cause of the

---

unexpected from FMC's perspective, then denial of coverage for *all* such property damage is entirely consistent with a policy of dissuading insureds from releasing pollutants which they subjectively expect to cause third party property damage." (*FMC*, *supra*, 61 Cal.App.4th at pp. 1179–1180.)

*AIU Ins. Co. v. Superior Court*, *supra*, 51 Cal.3d at page 837, an earlier decision in the same litigation, held that "reimbursement of environmental response costs is 'damages' under the terms of the insurance policies at issue here, and that public policy does not prevent coverage." In a footnote, the court added that section 533 "would apply to cleanup costs if the requisite factual predicate (i.e., that the hazardous waste disposal necessitating cleanup was 'willful') were to be proved." (*AIU*, at p. 837, fn. 16.)

17

current hazard even if the actions of others in response to those promotions and the passive neglect of owners also played a causal role." (*Ibid.*)

ConAgra argues the substantial factor causation standard used to establish liability does not necessarily apply to section 533, pointing to *Liberty Surplus Ins. Corp. v. Ledesma & Meyer Construction Co.* (2018) 5 Cal.5th 216 (*Ledesma*), as an example. The issue in that case was whether an employer's general liability insurance policy provided coverage for a suit alleging negligent hiring, retention, and supervision of an employee who sexually abused the minor plaintiff. (*Id.* at p. 220.) As ConAgra describes it, *Ledesma* held that an employer's "negligent hiring, retention, or supervision may be a substantial factor in a sexual molestation perpetrated by an employee, depending on the facts presented" (*id.* at p. 223), "but still refused to apply Section 533, because all the loss at issue did not result from willful acts of the insured."

But this is not what *Ledesma* held: *Ledesma* was not confronted with a question regarding the nature or extent of the loss but rather with whether an injury caused by an employee's intentional act might be covered, despite section 533, when alleged as the basis for a claim of negligent hiring retention and supervision against the employer. *Ledesma* emphasized that the claim against the employer focused on the *employer's* conduct, not that of the employee. (*Ledesma*, *supra*, 5 Cal.5th at p. 222.) While the employee's sexual misconduct was undisputedly " 'a wilful act' beyond the scope of insurance coverage under Insurance Code section 533," the employer was alleged to have committed an *independent tort* and the employee's "intentional conduct [did] not preclude potential coverage for" the employer's allegedly negligent conduct. (*Ibid.*)

18

Rather than supporting ConAgra's argument that the substantial factor test for causation does not apply to section 533, *Ledesma* went on to explain that "tort principles govern the question of causation" for purposes of liability insurance coverage and "causation is established for purposes of California tort law if the defendant's conduct is a 'substantial factor' in bringing about the plaintiff's injury." (*Ledesma*, *supra*, 5 Cal.5th at p. 223.) While the employee's intentional conduct was the immediate cause of injury and the employer's negligence an indirect cause, "a finder of fact could conclude that the causal connection between [the employer's] alleged negligence and the injury inflicted by [the employee] was close enough to justify the imposition of liability on [the employer]." (*Id.* at p. 225.) Thus, contrary to ConAgra's suggestion, *Ledesma* did not refuse to apply section 533 to the employer's conduct despite it being a "substantial cause" in causing the harm; it simply held section 533 did not bar coverage for negligent conduct that was the basis of an independent tort from the injury-causing intentional tort by the employee.

ConAgra provides no support for its contention that section 533 could not be found to apply in this case absent proof that specific promotions by Fuller directly resulted in the need for inspection or abatement in each home for which ConAgra was held liable for payment. The underlying litigation conclusively established ConAgra's liability for public nuisance based on Fuller's intentional promotion of lead paint for interior residential use with knowledge of the danger such use would create. (*Santa Clara II*, *supra*, 17 Cal.App.5th at p. 97.) *Santa Clara II* rejected arguments attempting to limit each defendant's liability to damage proven to be directly tied to that entity's product and/or promotions, explaining that imposition of liability for the promotions did not require proof that lead paint made by each of the

19

defendants was currently present in homes in the 10 jurisdictions or restriction of each defendant's liability to its proportionate contribution to creation of the public nuisance. (*Id.* at p. 108.) " ' "A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal." (Civ. Code, § 3480.) . . . [¶] "[P]ublic nuisances are offenses against, or interferences with, the exercise of *rights common to the public.*" (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1103.)" (*Santa Clara II*, at p. 112, quoting *Santa Clara I*, *supra*, 137 Cal.App.4th at p. 305.) " ' "[T]he critical question is whether the defendant *created or assisted in the creation of the nuisance.*" ' " (*Santa Clara II*, at p. 91, quoting *Santa Clara I*, at pp. 305–306.) *Santa Clara II* affirmed the trial court's determination that Fuller's promotions were a substantial factor in creating the public nuisance. (*Id.* at pp. 102–104.)

The question under section 533 is whether the loss for which an insured seeks indemnity was caused by a willful act of the insured. The loss at issue here is the amount ConAgra paid into the abatement fund due to its liability for creating the public nuisance. The insurers' duty to indemnify is determined by the actual basis of liability imposed on the insured (*Armstrong, supra*, 45 Cal.App.4th at p. 108)—here, liability for public nuisance as successor to Fuller, whose conduct was a substantial factor in creating the nuisance. ConAgra has provided neither authority nor persuasive reasoning to support its contention that a different causation

analysis is required under section 533 than that used to determine its underlying liability.[9]

## B.

ConAgra next argues the underlying findings did not establish as a matter of law that Fuller acted with the knowledge required for section 533 to apply. ConAgra argues the "actual knowledge" found in the underlying litigation is not the same as the subjective "substantial certainty" required to bar coverage under section 533, and Fuller's knowledge could be shown only by evidence that senior management was substantially certain its promotions would result in the loss for which ConAgra seeks indemnity, as to which no evidence was presented or findings made.

The underlying cases established that when Fuller promoted lead paint for residential use, it had " 'actual knowledge of the hazards of lead paint—including childhood lead poisoning," and specifically that "(1) 'lower level lead exposure harmed children,' (2) 'lead paint used on the interiors of homes would deteriorate,' and (3) 'lead dust resulting from this deterioration would poison children and cause serious injury.' " (*Santa Clara II*, *supra*,

---

[9] Arguing that section 533 cannot preclude indemnity because the loss for which it was held liable is not *all* due to a willful act by Fuller, ConAgra points out that while *Santa Clara II* limited the order to homes built before 1951—because there was no evidence of promotions after 1950—the order would still apply to lead hazards from paint applied *after* 1950 in homes built before. Lead paint applied after 1950, ConAgra maintains, cannot be tied to any influence from Fuller's promotions.

This argument confuses issues of liability and remedy. ConAgra was held liable for creation of a public nuisance in homes constructed prior to 1951 by promoting lead paint for interior residential use at that time. Even if the remedy—abatement of lead hazards in pre-1951 homes—results in some of the abatement funds being used for abatement in homes that were actually painted after 1951, ConAgra's loss was due to its liability for the public nuisance created by the willful act of Fuller.

21

17 Cal.App.5th at p. 85.) *Santa Clara II* found substantial evidence that Fuller (and therefore ConAgra) "must have known by the early 20th century that interior residential lead paint posed a serious risk of harm to children." (*Id.* at pp. 85–89.)

The trial court viewed the findings that Fuller knew " 'lead paint used on the interiors of homes *would* deteriorate' " and " 'lead dust resulting from this deterioration *would* poison children and cause serious injury' " satisfied section 533's willfulness standard. ConAgra argues, however, that for section 533 to apply, there would have to be evidence that Fuller believed the "widespread prevalence of deteriorated lead paint" found to constitute a public nuisance in this case "was substantially certain to result from its few actionable promotions" and that Fuller knew all the events ConAgra sees as having intervened during the decades following the promotions would occur and be substantially certain to result in the widespread deterioration. In ConAgra's view, "Fuller's promotions could have resulted in present-day lead hazards inside homes only if (1) people were influenced by Fuller promotions (above all other lead paint promotions), (2) those so influenced placed lead paint inside of homes, (3) that paint gradually deteriorated, and (4) the paint was not properly maintained or abated in the ensuing decades."

These arguments are based on premises rejected in *Santa Clara II.* The trial court in the underlying cases expressly found that lead paint " 'inevitably deteriorates,' " as well as that " '[s]ince antiquity, it has been well known that lead is highly toxic and causes severe health consequences when ingested' and that '[e]ven relatively low levels of lead exposure have severe health consequences.' " (*Santa Clara II*, *supra*, 17 Cal.App.5th at p. 79.) The finding that Fuller promoted lead paint for interior residential use with actual knowledge that lead paint "would deteriorate" and the

22

resulting lead dust "would poison children and cause serious injury" was, in essence, a determination that Fuller must be deemed to have known the deterioration of lead paint and resulting harm to children was inevitable. These findings, conclusively established by *Santa Clara II*, cannot be reconciled with any conclusion other than that Fuller "knew or believed its conduct was substantially certain or highly likely to result" (*Shell Oil, supra,* 12 Cal.App.4th at p. 748) in the conditions found in this case to be a public nuisance.[10]  We therefore agree with the trial court that the actual knowledge

_____

[10] ConAgra argues the trial court improperly drew inferences against it, contrary to the rule that "[s]ummary judgment may not be granted by the court based on inferences reasonably deducible from the papers submitted, if such inferences are contradicted by other inferences which raise a triable issue of fact." (*Hepp v. Lockheed-California Co.* (1978) 86 Cal.App.3d 714, 717–718.)  ConAgra points to the statement in the trial court's order granting summary judgment that "the reasonable inference is that Fuller would not have spent money to promote lead paint had it not expected sales and thus damage."

A trial court is not prohibited from drawing reasonable inferences from the evidence on summary judgment, only from granting the motion on such inferences if they are contradicted by other inferences or evidence:  "In determining if the papers show that there is no triable issue as to any material fact, the court shall consider all of the evidence set forth in the papers . . . and all inferences reasonably deducible from the evidence, except summary judgment shall not be granted by the court based on inferences reasonably deducible from the evidence if contradicted by other inferences or evidence that raise a triable issue as to any material fact." (Code Civ. Proc., § 437c, subd. (c).)

There could be no *reasonable* inference to contradict the inference that Fuller would not have spent money on promotions of lead paint if it did not expect such promotions to result in sales.  The inference that Fuller expected the promotions to result in the harm caused by lead paint was drawn by courts in the underlying litigation (*Santa Clara II, supra,* 17 Cal.App.5th at pp. 88–89 [evidence of actual knowledge], 106 [inference that promotions increased use of lead paint]) and *applied* by the trial court in the present case.

findings in the underlying litigation establish the "willful act" required for application of section 533.

To reiterate, ConAgra was found liable for creation of a public nuisance, not for specific injuries to specific properties. As explained in *Santa Clara I*, the underlying case was "a *representative* public nuisance cause of action seeking *abatement* of a hazard created by affirmative and knowing *promotion of a product for a hazardous use . . . .* Because this type of nuisance action does not seek damages but rather abatement, a plaintiff may obtain relief *before* the hazard causes any physical injury or physical damage to property." (*Santa Clara I*, *supra*, 137 Cal.App.4th at p. 309.) ConAgra's efforts to require proof of a direct link between Fuller's promotions of lead paint for residential use and resulting damage to specific homes ignores this fundamental aspect of its liability.

ConAgra's contention that section 533 could only apply if it was established that Fuller's *management* had the required knowledge and expectation of damage is not persuasive. ConAgra argues that because section 533 "distinguishes between the insured and its agents, the term 'the insured' applies only to the corporate entity's conduct and knowledge," and "[w]hile the conduct and knowledge of lower-level employees is imputed to the corporation for purposes of establishing liability, such agency and respondeat superior principles are not the same as the right of a corporation to be insured under a policy of indemnification." According to ConAgra, the underlying findings are an insufficient basis for application of section 533 because they did not establish what individuals within Fuller had knowledge and whether such individuals had authority over significant aspects of Fuller's business.

The cases ConAgra discusses in support of this argument stand for the general principle that "section 533 does not preclude insurance coverage for an 'innocent' or a negligent insured under a liability insurance policy" (*National Union fire Ins. Co. v. Lynette C.* (1991) 228 Cal.App.3d 1073, 1085 [foster father's sexual molestation of child did not preclude insurance coverage for foster mother's negligent failure to supervise]) and specifically, as earlier discussed, that section 533 does not bar coverage for a principal found vicariously liable for its agent's willful act. (E.g., *Federal Ins. Co. v. Steadfast Ins. Co.* (2012) 209 Cal.App.4th 668, 680–681; *Nuffer v. Insurance Co. of North America, supra*, 236 Cal.App.2d at pp. 355–356; *Borbor, supra*, 826 F.2d at p. 890; *Downey, supra*, 66 Cal.App.4th at p. 512; *Century-National Ins. Co. v. Garcia, supra*, 51 Cal.4th at pp. 566, 573.) But there is nothing in the appellate or trial court opinions in the underlying litigation to suggest ConAgra's liability was based on Fuller's vicarious liability for an employee's acts rather than for Fuller's own acts as a corporation. ConAgra does not explain how emphasizing the distinction between acts and intentions of an insured and those of its agents illuminates the means by which a corporate entity's knowledge should be determined.

The trial court cited *FMC, supra*, 61 Cal.App.4th at pages 1212–1214, in holding that for purposes of section 533 and the determination whether damage was expected, "an entity's employees' collective knowledge—not just senior managers' knowledge— is what matters." *FMC* upheld jury instructions to the effect that a corporation is deemed to have knowledge of whatever its employee has knowledge of while acting in the course of his or her employment, rejecting the argument that knowledge can be imputed to a corporation only if it is shown to exist on the part of high level corporate

25

managers. (*FMC*, at p. 1213.)[11] *FMC* is consistent with the general rule that, under the doctrine of imputed knowledge, "[a] principal is chargeable with and is bound by the knowledge of, or notice to, his agent received while the agent is acting within the scope of his authority and which is with reference to a matter over which his authority extends." (*Columbia Pictures Corp. v. De Toth* (1948) 87 Cal.App.2d 620, 630; *Northern Natural Gas Co. v. Superior Court* (1976) 64 Cal.App.3d 983, 992.)

ConAgra does not directly challenge *FMC*'s holding but instead argues that because that case involved a trial at which various employees testified, *FMC* demonstrates a court must receive testimony showing "who within the company knew what," which the trier of fact must then evaluate to determine whether the evidence establishes the company's knowledge. ConAgra emphasizes its view that "in the public nuisance case, the courts were not required to determine who within Fuller had the knowledge required to impose liability, but section 533 requires differentiation among knowledge held within a corporate insured," and, therefore, "the underlying findings of Fuller's 'actual knowledge' are not determinative of whether there was a willful act of 'the insured' under section 533."

---

[11] The insurers quote another court's statement that, with respect to whether a corporation expects or intends property damage, "the collective knowledge of a corporation's employees which they receive while acting within the scope of their authority and which is with reference to a matter over which their authority extends is the knowledge of the corporation." (*Syntex Corp. v. Lowsley-Williams & Companies* (1998) 67 Cal.App.4th 871, 895, review granted Feb. 24, 1999, review dismissed Feb. 16, 2000, S075573.) Although the California Supreme Court dismissed review, its prior grant of review automatically depublished the Court of Appeal opinion (former Cal. Rules of Court, rules 8.1115 & 977) and the order dismissing review did not order that opinion republished. Accordingly, the case is not citable precedent.

But ConAgra offers no authority for its distinction between the knowledge required for liability and that required for application of section 533 other than the vicarious liability cases. Contrary to ConAgra's characterization, these cases do not reflect any requirement that a corporation's knowledge, for purposes of section 533, can be shown only by proof of the knowledge of high-level corporate managers.

The underlying litigation established that Fuller—the corporate entity—had actual knowledge of the harms associated with lead paint when it promoted lead paint for interior residential use. We have already concluded that this actual knowledge finding necessarily means Fuller acted with knowledge that lead paint was "substantially certain" or "highly likely" to result in the hazard found to exist in the underlying litigation, and therefore established the willful act required to trigger section 533 prohibition against insurance coverage. ConAgra's argument that the knowledge required for application of section 533 required proof of what knowledge was held by specific individuals within the company is in effect a challenge to factual determinations made in the underlying litigation that are now final and binding. As we have said, an insurer's duty to indemnify is determined by the actual basis of liability imposed on the insured. (*Armstrong, supra,* 45 Cal.App.4th at p. 108.) Since the findings establishing that liability also establish the willful act required for application of section 533, ConAgra's position is untenable.

## DISPOSITION

The judgment is affirmed.

27

_____

Kline, J.*

We concur:

_____

Richman, Acting P.J.

_____

Miller, J.

*Certain Underwriters at Lloyd's London et al. v. ConAgra Grocery Products Company et al.* (A160548)

* Assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

28

| | |
|---|---|
| Trial Court: | San Francisco County Superior Court |
| Trial Judge: | Hon. Richard B. Ulmer, Jr. |

Attorneys for Appellants:
ConAgra Grocery Products
Company

Reed Smith
Raymond A. Cardozo
David E. Weiss
T. Connor O'Carroll

Attorneys for Respondents:
Certain Underwriters at
Lloyd's London; Winterthur
Swiss Insurance Company;
The Northern Assurance Co. of
America; Yasuda Fire &
Marine Insurance Company:

Zuckerman Spaeder
Carl S. Kravitz (*Pro Hac Vice*)
Caroline E. Reynolds (*Pro Hac Vice*)
Alicia Shelton (*Pro Hac Vice*)

Nicolaides Fink Thorpe Michaelides Sullivan
Sara M. Thorpe
Ethan H. Seibert

Affiliated FM Insurance Co.:

Hinshaw & Culbertson
John E. DeLascio (*Pro Hac Vice*)
Scott M. Seaman (*Pro Hac Vice*)
Robert G. Levy

AIU Insurance Co.; American
Home Assurance Company;
Granite State Insurance Co.; The
Insurance Company of the State
of Pennsylvania; Lexington
Insurance Co.; National Union
Fire Insurance Co. of Pittsburgh,
Pennsylvania:

Selvin Wraith Halman
Gary R. Selvin

Chaffetz Lindsey
Charles J. Scibetta (*Pro Hac Vice*)
Ted Debonis (*Pro Hac Vice*)

American Guarantee & Liability
Insurance Co.; American Zurich
Insurance Co.; Zurich Reinsurance
Co. Ltd.; Zurich Insurance Co.:

Skarzynski Marick & Black
James H. Kallianis, Jr.

Sinnott, Puebla, Campagne & Curet
Debra R. Puebla
Robert A. Sanders

29

| | |
|---|---|
| Arrowood Indemnity Company; Century Indemnity Company; Pacific Employers Insurance Co.; Westchester Fire Insurance Co.; Westchester Surplus Lines Insurance Company: | Clyde & Company US<br>Bruce D. Celebrezze<br>Dean J. McElroy<br>W. Andrew Miller<br>Paul R. Koepff (*Pro Hac Vice*)<br>Ryan Westerfield (*Pro Hac Vice*)<br>Peter J. Whalen<br><br>O'Melveny & Myers<br>Jonathan Hacker (*Pro Hac Vice*) |
| Ancon Insurance Company; Brittany Insurance Company; CAN Reinsurance Company; Dominion Insurance Company; Terra Nova Insurance Company; Harper Insurance; La Union Atlantique; St. Katherine Insurance Company: | Foran Glennon Palandech Ponzi & Rudloff<br>Edward P. Murphy |
| Employers Insurance Company of Wausau: | Dorsey & Whitney<br>Faisal M. Zubairi |
| Everest Reinsurance Company; Fairmont Premier Insurance Co.; Crum & Forster Insurance Co.; United States Fire Insurance Co.: | Crowell & Moring<br>Mark D. Plevin<br>Laura A. Foggan (*Pro Hac Vice*) |
| Fireman's Fund Insurance Co.; Allianz Underwriters Insurance Company: | Tressler<br>Mary McPherson |
| First State Insurance Co.; Hartford Fire Insurance Co.; New England Insurance Co.; Twin City Fire Insurance Co.: | Kendall Brill & Kelly<br>Alan Jay Weil<br>Shauna E. Woods |
| Great American E&S Insurance Company; Safety National Casualty Corporation: | Duane Morris<br>William J. Baron<br>Philip R. Matthews |

30

Munich Reinsurance America,
Inc.; Executive Risk Indemnity:

Craig & Winkelman
Bruce H. Winkelman

Old Republic Insurance Co.:

Wolkin Curran
Brandt L. Wolkin
Jennifer Elowsky

The Continental Insurance Co.;
National Fire Insurance Co. of
Hartford; Columbia Casualty Co.;
Continental Casualty Co.:

CNA Coverage Litigation Group
Edward J. Tafe

Dentons US
M. Keith Moskowitz (*Pro Hac Vice*)
Kristen C. Rodriguez (*Pro Hac Vice*)
Shannon Y. Shin (*Pro Hac Vice*)

Travelers Casualty and Surety
Company; St. Paul Surplus
Lines Insurance Company:

Simpson Thacher & Bartlett
Stephen P. Blake
Bryce L. Friedman (*Pro Hac Vice*)
Susannah S. Geltman (*Pro Hac Vice*)

31